UNITED STATES of America,
Plaintiff,

v.

AEROQUIP CORPORATION, Anchor Coupling Co., Inc., Imperial-Eastman Corporation, National Hose Assemblies Manufacturers Association, Parker-Hannifin Corporation, Stewart-Warner Corporation, Stratoflex, Inc., the Weatherhead Company, George P. Byrne, Jr., William F. Rogge, C. A. Thomas and Augustus S. Wade, Defendants.

Cr. No. 41312.

United States District Court
E. D. Michigan,
Southern Division.

April 30, 1968.

See also D.C., 41 F.R.D. 441.

Jesse Climenko and Jerome D. Grant, of Shea, Gallop, Climenko & Gould, New York City, Maxwell F. Badgley and John Schomer, of Badgley, Domke, McVicker & Marcoux, Jackson, Mich., for Aeroquip Corp.

Harrison T. Watson, of Watson Lott & Wunsch, Detroit, Mich., for William F. Rogge.

Patrick W. O'Brien, William A. Wineberg, Jr., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., and A. Stewart Kerr, Sweeny, Dodd, Kerr, Wattles & Russell, Detroit, Mich., for Anchor Coupling Co., Inc.

Edward H. Hatton, Robert L. Bombaugh and Hugh M. King, Raymond, Mayer, Jenner & Block, Chicago, Ill., William R. Bryant, Jr., Watson, Lott, & Wunsch, Detroit, Mich., for Imperial-Eastman Corporation.

John A. Sullivan, Cadwalader, Wickersham & Taft, New York City, William R. Bryant, Jr., Local Counsel, Watson, Lott & Wunsch, Detroit, Mich., for National Hose Assemblies Manufacturers Association and George P. Byrne, Jr.

William D. Ginn, John F. McClatchey, Thompson, Hine & Flory, Cleveland,

Ohio, William R. Bryant, Jr., Watson, Lott & Wunsch, Detroit, Mich., for Parker-Hannifin.

Earl A. Jinkinson, John W. Stack, Winston, Strawn, Smith & Patterson, Chicago, Ill., Robert C. Winter, Local Counsel, Clark, Klein, Winter, Parsons & Prewitt, Detroit, Mich., for Stewart-Warner Corp.

Cecil E. Munn, Edward Kemble, Cantey, Hanger, Gooch, Cravens & Scarborough, Fort Worth, Tex., John Feikens, Local Counsel, Feikens, Dice, Sweeny & Sullivan, Detroit, Mich., for Stratoflex Inc. and C. A. Thomas.

Bruce W. Eaken, Victor H. DeMarco, George H. Rudolph, Jones, Day, Cockley & Reavis, Cleveland, Ohio, William R. Bryant, Jr., Local Counsel, Watson, Lott & Wunsch, Detroit, Mich., for Weatherhead Co. and Augustus S. Wade.

Dwight B. Moore, David G. Budd, Carl L. Steinhouse, Acting Chief, Anti-Trust Dept., Dept. of Justice, Cleveland, Ohio, Lawrence Gubow, U. S. Dist. Atty., Detroit, Mich., for the United States.

## MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S MOTION TO CONNECT AND GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL.

MACHROWICZ, District Judge.

This is a criminal anti-trust matter in which seven corporations, one trade association and four individuals were indicted for violating section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The corporate defendants in this case are Aeroquip Corporation, herein after referred to as *Aeroquip*, Anchor Coupling Co., Inc., hereinafter referred to as *Anchor*, Imperial-Eastman Corporation, hereinafter referred to an *Imperial*, Parker-Hannifin Corporation, hereinafter referred to as *Parker*, Stewart Warner Corporation, hereinafter referred to as *Stewart Warner*, Stratoflex, Inc., hereinafter referred to as *Stratoflex*, and The Weatherhead Company, hereinafter referred to as

*Weatherhead*. The defendant trade association, The National Hose Assemblies Manufacturers Association, is hereinafter referred to as the *Association*. The individual defendants, together with the position each held during all or part of the time period covered in the indictment are William F. Rogge, vice-president and general manager, Industrial Division, Aeroquip; C. A. Thomas, president, Stratoflex; Augustus S. Wade, general sales manager, Ft. Wayne Division, Weatherhead; and George P. Byrne, Jr., secretary, the Association.

A jury was empanelled and the government entered its proofs. At the end of nine weeks of trial, during which extensive documentary and testimonial evidence was introduced, the government rested subject to its motion to admit into evidence a certain document identified as PX 693–695 and subject further to its motion to connect all evidence as to all defendants which the court has heretofore admitted as to various defendants only.

Defendants filed motions for judgment of acquittal and motions to dismiss challenging the sufficiency of the indictment. Extensive briefs were filed on behalf of all parties. The motions came on for hearing and, following extensive arguments and filing of briefs, were then taken under advisement.

The first motion to be considered herein is the motion to admit PX 693–695 and to connect the evidence as to all defendants. PX 693–695 is a letter written by defendant Rogge to George Fischer, then manager of hose sales of B. F. Goodrich and allegedly chairman of a liaison committee of the Rubber Manufacturers' Association working with a subcommittee of the defendant Association. The letter is clearly admissible as against its author defendant Rogge. However, it also contains statements which, if made in furtherance of the alleged conspiracy, would be admissible against all such defendants as were shown by independent proof to be members of such conspiracy. The ruling on the admission of this docu-

ment was postponed by the court, because of its highly prejudicial nature, until such time as the alleged conspiracy and the connection of each of the defendants had been established by independent proof. The motion raises the issue whether such proof now exists in the record to warrant the admission of this letter as a declaration of a co-conspirator in furtherance of the conspiracy, binding upon anyone other than the declarant himself. In connection with the same inquiry, the court must consider whether other declarations of alleged co-conspirators, previously admitted only as to the declarant, and other evidence previously admitted only as to certain defendants should now be connected up and considered as evidence against all defendants.

The first question to be determined is what kind of proof must be introduced before acts and declarations of co-conspirators may be considered as against any other alleged co-conspirators. The government cites United States v. Ragland, 375 F.2d 471 (2d Cir. 1967), for the proposition that the government must show only a likelihood of the existence of a combination among the defendants for the declarations of co-conspirators to be admissible. The language in that opinion referred to is as follows:

> The threshold requirement for admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant although it might later eventuate that the independent evidence so admitted proves to be insufficient to justify submitting to the jury the issue of defendant's alleged guilty involvement with declarant. * * * In determining preliminary questions of fact relating to admissibility of the hearsay the trial judge has wide discretion, * * * and need only be satisfied, if he accepts the independent evidence as credible, that the evidence is sufficient to support a finding of a joint undertaking. (At 477.)

In further support of this proposition, the government cites the following language in Continental Baking Co. v. United States, 281 F.2d 137 (6th Cir. 1960):

> The Government had introduced evidence of meetings in which all the alleged conspirators participated, dating back to about October, 1953. That evidence was sufficient to provide a foundation for the introduction of evidence of other acts on the part of one conspirator, in furtherance of the conspiracy, binding on all. (At 151–152.)

Defendants cite many of the same cases relied upon by the government, but read in them a requirement of a much higher burden that the government must shoulder before hearsay declarations and acts of conspirators are admissible against any other alleged co-conspirators. Defendants contend that the law requires independent evidence of at least a strong likelihood of an *illicit* association between a declarant and alleged conspirators before acts and statements of one are admissible against the others, (see the language of *Ragland* quoted above,) and that these acts and statements are only admissible when done in furtherance of the conspiracy's objectives.

The Supreme Court, in Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), made the following remarks on this issue:

> [T]here are many logical and practical reasons that could be advanced against a special evidentiary rule that permits out-of-court statements of one conspirator to be used against another. But however cogent these reasons, it is firmly esablished that where made in furtherance of the objectives of a going conspiracy, such statements are admissible as exceptions to the hearsay rule. This prerequisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been scrupulously observed by federal courts. (At 443–444, 69 S.Ct. at 718.)

See also Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892).

■■ Based upon a review of these and other authorities, the court finds that the government, in a conspiracy case, must at least show, by *substantial* independent proof, a strong likelihood of the existence not only of an association but of the very conspiracy charged in the indictment, including its objectives and purposes, and the connection of the various defendants to the illicit combination. Although this proof need not be sufficient by itself to justify submitting the case to the jury, as indicated in the above-quoted language of *Ragland,* it still must be more than such as merely establishes the existence of *some* combination of defendants for any purpose. The agreement or combination to pursue an illegal purpose or a legal purpose through illegal means must be established by independent proof, as must the connection of each defendant therewith, before acts and statements made in the absence of defendants by an alleged conspirator in furtherance of the conspiracy may be considered as binding upon other alleged co-conspirators. Indeed, the cases cited by the government and referred to above contained factual situations based upon substantial independent evidence from which could legally be inferred not only an association, but also a conspiracy to pursue an illegal purpose or a legal purpose through illegal means, as charged in the indictments.

Applying the standard, outlined above, the court will now proceed to review the evidence in this record. The following discussion is based upon the assumption that PX 693–95 is at least admissible as against its author, defendant Rogge.

The gist of the conspiracy charged in the indictment is two-fold. The defendants are charged to have combined for the purposes of securing a price advantage over their competitors by persuading and inducing hydraulic hose manufacturers to adopt and maintain a classification of customers based upon qualifications which preclude their competitors from obtaining the lowest price on the purchase of hydraulic hose and by persuading and inducing said hose manufacturers to increase the spread between the price paid for hydraulic hose by the defendants and that paid by their competitors. Simply stated, the defendants are charged with attempting to have their suppliers adopt qualifications which would preclude their competitors from obtaining the lowest price as available to defendants and with attempting to increase the price spread between the defendants' price and the next highest price level.

Some background information, as revealed in the record, is necessary for an understanding of the charges in this matter and for a proper evaluation of the evidence presented. The seven defendant corporations are manufacturers of hydraulic hose fittings, couplings and assemblies and are commonly called couplers. As such, they perform a vital link in preparing industrial hose for use in various hydraulic systems of machinery, farm equipment, and so on. The basic material which the defendants and other couplers purchase is the hydraulic hose. This they test, cut, apply the proper fittings to and then sell to distributors, original equipment manufacturers and others. They have research, design, engineering and testing facilities and have been instrumental in developing the uses to which their finished product can be put, resulting in a greatly expanded industry over the past several decades. The defendant Association is a trade association composed of twenty or more coupling manufacturers, including the seven corporate defendants herein. There is also evidence in the record that the defendant couplers are the major coupling manufacturers in this country and are the principal purchasers of industrial hydraulic hose.

Historically, the price structure on industrial hydraulic hose has been based upon the functional classification of the customers. For many years before the commencement of the alleged conspiracy the couplers have received the lowest price, with distributors, original equipment manufacturers and other functional classifications receiving proportionately

higher prices. The situation continues today.

The portion of the case, relating to the price-classification system does not involve a conspiracy to originate this above-described system with the rubber hose manufacturers, as much as a conspiracy to maintain and strengthen such a system and to have it applied in a discriminatory manner so that actual or potential competitors of defendants could not receive the lowest price on hose, and hence could not effectively compete.

The government concedes that there is no direct proof in the record of the defendants' conspiracy. Rather, the government argues that it has presented *prima facie* evidence, albeit circumstantial in nature, of the likelihood of an illicit combination necessary for the admission of declarations of its members against each other.

The government summarizes its evidence as follows. Defendant companies are the principal purchasers of industrial hydraulic hose, thus giving them the power to exert effective pressure on hose manufacturers with respect to the latter's pricing policies. It is necessary to receive the couplers' price for hydraulic hose in order to compete effectively with the defendant companies, but some of the defendant companies do not or did not in the past actually meet the qualifications for this price level, even though they received it. The defendant companies became members of the defendant Association in 1958 and the individual defendants, together with other representatives of the defendant companies, attended meetings of the Association, including meetings with representatives of hose manufacturers. Most or all of the corporate defendants were shown to have made inquiries to hose manufacturers concerning various accounts receiving the couplers' price which did not appear to be justified to the party making the inquiry. Finally, evidence was introduced demonstrating the "state of mind" of the hose manufacturers, which indicated that these manufacturers were well aware of the defendant companies' market strength in the purchase of hose and hence of the necessity of cooperating with the defendants on all matters, including sales policy. From this evidence, the government contends that the likelihood of an illicit conspiracy can be inferred sufficient to connect up the declarations of various co-conspirators.

The court will now consider this evidence in more detail. The record reveals that a meeting of the Association took place on January 31, 1958 at the Bismarck Hotel, Chicago, Illinois. (PX 524.) In the minutes of this meeting, the following information appears:

*Liaison with Rubber Manufacturers Association*

Since one of the basic raw materials of hose assemblies is rubber tubing, members expressed the view that worthwhile benefits would accrue from liaison with the Rubber Manufacturers Association.

It was suggested that technical work and cooperative efforts in direction of approving basic raw materials might be undertaken which would result in cost savings both for rubber manufacturers as well as hose assemblies and fittings manufacturers. The following were appointed as a group to consider steps which should be taken to establish a relationship with the rubber manufacturers association and report at the next meeting: W. F. Rogge, A. F. Wade, Walter Fritsch, C. A. Thomas. (PX 527.)

PX 693–695, the exhibit discussed above, which the government now seeks to connect as to all defendants, purports to be a letter from defendant Rogge to George Fischer, Chairman, Rubber Manufacturers Association, dated February 20, 1958. This letter is purportedly written on behalf of the Association and contains the following paragraph:

One of our industry's problems and objectives is to work closer with the Rubber Manufacturers Association. Since the combined companies in this group represent the great majority of hose volume to the RMA, we feel that

a closer working relationship and understanding is necessary. A committee was formed to study this problem and which met recently to draft certain proposals which are listed below. (At PX 693.)

The letter then proceeded to make several proposals relative to the matters charged in the conspiracy, namely the maintaining and strengthening of the functional qualification pricing system and increasing the price spread on rubber covered hose between the couplers' price and the next highest price level. The letter concluded with this paragraph:

> As chairman of the committee that has made these proposals, I would appreciate hearing from you as soon as your RMA members have had an opportunity to discuss this. I will then report to the Hose Assemblies and Fittings Manufacturers at our next meeting. (At PX 695.)

The letter indicated that copies were sent to W. Fritsch of Anchor, C. Thomas, Stratoflex, G. Wade, Weatherhead, G. Byrne and others.

The minutes of the next meeting of the Association indicate that it was held on March 6, 1958, again at the Bismarck Hotel in Chicago. (PX 528.) The following statement appears in those minutes.

> Mr. Rogge then outlined several worthwhile objectives which will be forthcoming through closer liaison with rubber manufacturers which are the principal suppliers of raw material to the hose assemblies industry. He pointed out that particularly in the engineering field, improved standards in sizes, materials, etc., would serve a useful purpose. It was suggested that in due course the Industry Product Development Committee might meet with technical committees of the RMA. (At PX 531.)

The government contends that an incriminating inference can be drawn from this statement, together with the statement in the minutes of the January 31, 1958 meeting appointing defendant Rogge and others to consider steps in establishing a better relationship with the hose manufacturers and the Rogge letter which followed that meeting. This inference is that the group appointed at the January 31 meeting was really set up for the purpose of working out the details of the conspiracy as charged in the indictment, although not so stated in the minutes, that such a group actually did meet, that the Rogge letter was written pursuant to an agreement worked out at the meeting of this smaller group, that the Rogge letter was therefor written on behalf of and with the authority of the Association and its members, and that the "several worthwhile objectives" reported by Mr. Rogge at the March 6 meeting were in fact the details of the conspiracy, as set forth in the Rogge letter, and that these "objectives" were henceforth pursued by all defendants with knowledge and approval of the conspiratorial plan. The other kinds of evidence, discussed above, of inquiries made by the individual defendants to the hose manufacturers concerning various accounts receiving the couplers price and the "state of mind" of the hose manufacturers should be considered, according to the government, as facts from which the jury can infer that these inquiries and the creation of this "state of mind" were done pursuant to a conspiracy. The government further contends that this evidence establishes the connection of each defendant with the conspiratorial plan in that each such incident was performed in furtherance thereof.

The record also contains evidence that a meeting was held sometime after July, 1958, referred to by George Fischer as a "get acquainted" meeting. Representatives of the hose manufacturers and the couplers were present at this meeting and spent approximately an hour and one half discussing with each other a name for the association that would be "descriptive of what these coupling manufacturers actually did, such as manufacture fittings, manufacture hose assemblies, design fittings, service to trade." (Tr.

3606.) The government claims that this is evidence from which one can infer concerted action on behalf of the defendants, including the Association, to have the hose manufacturers maintain and manipulate a discriminatory pricing system based upon qualifications as set by the defendants, rather than by the hose manufacturers themselves.

In support of the charge of an alleged conspiracy to persuade the suppliers to increase the spread between the price paid for hydraulic hose by the defendants and that paid by their competitors, in addition to the evidence referred to above, the government relies on the testimony of one Meissner, a representative of one of the suppliers, that at the Homestead meeting in 1959 or 1960, attended by representatives of both couplers and their suppliers, one unidentified person, presumably a coupler representative, rose during a discussion of specifications, tolerances, lengths and new hose to inquire about a disparity between the spread on cotton-wire and conventional rubber hose. (Tr. 3512–3524.) In the first instance the price to the couplers was 25% off the price charged to the next classification, while in the second instance, i. e., on rubber-covered hydraulic hose it was only 19%. He proposed equalizing the two spreads to make both 25%, which would in fact lengthen the spread on rubber-covered hose in favor of the couplers. The witness characterized the discussion as an "inquiry indicating a lack of understanding as to why they could buy one hose at one price and another at a different price." He said that nothing further was said by the hose manufacturer's representatives nor by any other coupler representatives on this subject at the meeting. The evidence also discloses no further action taken by the suppliers and the spread in the prices remained the same, just as it had existed for many years previous thereto.

This evidence, in addition to that previously referred to, and various individual inquiries made at the other times separately by some defendants, is relied on by the government as being such that a conclusion may be drawn that defendants were so acting pursuant to an agreement among themselves.

■ The court is aware that conspiracy cases can rarely be proved by direct evidence and that courts generally permit great latitude in the use of circumstantial evidence in these kinds of cases. However, the court must also keep in mind that our system of jurisprudence does not permit criminal convictions to be based upon mere suspicion or remote possibility.

■■ The court finds that the inferences which must be drawn from the evidence presented in order to find independent proof of the conspiracy are, on the state of this record, far too speculative to be permissible. The ultimate inferences contended for by the government are themselves based upon other inferences, which in some critical instances, are also based upon inferences. The central inquiry in this matter is whether the acts and statements of the defendants were actually performed pursuant to an agreement and with the authority of the other alleged co-conspirators. The court will not bypass the requirement that a conspiracy be proved by independent evidence by simply inferring a conspiracy from the isolated acts of individuals and from vague reference of subjects of conversation which may or may not have involved illegal objectives. For these reasons, the court finds that the government has failed to present sufficient independent proof of the conspiracy to permit connection of the evidence as to all defendants.

Based upon the above finding that a conspiracy has not been established, it follows *a fortiori* that the government has failed to prove a *prima facie* case against the defendants.

Accordingly, the motions for judgment of acquittal filed on behalf of each defendant should be granted. It therefor becomes unnecessary to rule on the other matters raised by defendants in their motion to dismiss the indictment.

It is ordered that the government's motion to connect the evidence as to all defendants be, and it hereby is, denied and that each defendant's motion for judgment of acquittal be, and it hereby is, granted.