M. D. RUTLEDGE, doing business as Rubber Hose Supply Company and Industrial Hose and Rubber Company, and Mechanicals, Inc., a corporation, Plaintiffs,

v.

ELECTRIC HOSE AND RUBBER COMPANY, a corporation, et al., Defendants.

No. 69-825.

United States District Court, C. D. California.

April 22, 1971.

Monty G. Mason II, Los Angeles, Cal., for plaintiff; M. D. Rutledge, in pro. per.

O'Melveny & Myers, Patrick Lynch, Gibson, Dunn & Crutcher, Newlin, Tackabury & Johnston, Mitchell, Silberberg & Knupp, Latham & Watkins, Sheppard, Mullin, Richter & Hampton, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., Cantey, Hanger, Gooch, Cravins, Fort Worth, Tex., Burdett & Gleason, Panorama City, Cal., Arthur, Day, Kalish, Taylor & Wood, New York City, Domke, Marcoux, Allen & Beaman, Jackson, Mich., Thompson, Hine & Flory Jones, Day, Cockley & Reavis, Cleveland, Ohio, Winston, Straw, Smith & Patterson, Chicago, Ill., for defendants.

## ORDER GRANTING MOTION TO DISMISS UNDER F.R.C.P. 41(b).

DAVID W. WILLIAMS, District Judge.

Certain of the defendants in this case are manufacturers of hydraulic hose.[1] Their product is used in a variety of equipment including automotive hydraulic systems, aircraft systems, earthmoving and agricultural equipment. Hydraulic hose is the term applied to reinforced flexible hose whose primary function is to carry fluids under relatively high pressure. It is generally made to comply with specifications or standards fixed by the Society of Automotive Engineers (SAE). Hydraulic hose is actually a series of hoses which have been reinforced with steel, wire or cotton to

---

1. These defendants are Electric Hose and Rubber Co., B. F. Goodrich, Goodyear Tire and Rubber Co., H. K. Porter Co., and Uniroyal.

resist internal pressure. An inner tube is wrapped with the reinforcing material, such as wire braid or fabric braid. This hose is not useful without a fitting or coupling attached to it and the mating of the hose to the fitting produces what the industry calls a hose assembly. Such fittings are carefully designed for the particular purpose for which the assembly is to be used. Since high pressures are involved, the hose and fitting must be designed and attached so as to provide maximum safety in the use of the assembly.

The remaining defendants herein are couplers.[2] They engineer and manufacture fittings which they attach to hose bought from hose manufacturers. This hose assembly is then sold by them to original equipment manufacturers (OEM), such as manufacturers of automobiles or forklifts, or to the replacement market (sometimes called the aftermarket). Couplers require the hose they buy to be manufactured to their specialized requirements and the product is subjected to rigid testing. It is the couplers who develop new uses for hydraulic control assemblies and they market their product with large sales and service staffs.

M. D. Rutledge owns the companies designated as plaintiffs in this case. He describes himself as a small manufacturer of couplings which he crimps or attaches to hose ends to form assemblies. The larger part of his business is manufacturing and selling automobile power-brake assemblies. Like the coupler defendants, Rutledge must make his hose purchases from the various hose manufacturers. He complains that he is the victim of a conspiratorial and unlawful arrangement between the various hose manufacturers and the defendant couplers which permits the latter to buy their hose supply from the former at prices as much as 25% below the level at which the hose manufacturers will sell the same to Rutledge. He argues that there is no legitimate basis for refusing him the coupler price and that the refusal prevents him from expanding his business and seeking a part of the OEM market.

There is no denial that the defendant hose manufacturers extend a so-called coupler's price to those coupling assemblers whom the hose people qualify as such, or that the discount amounts to about 25%. The hose manufacturers justify this discount as compensation correctly due a qualified hose assembler since the assembler performs a valuable service to the hose manufacturer, viz., he makes the hose usable in the market place by designing and attaching the fitting thereto, testing the product, selling it to a national market, and servicing it by field agents.

For many years plaintiff has tried to convince the hose manufacturers that his small business should meet the ordinary definition of a coupling assembler. Plaintiff contends that their refusal to qualify him as a coupler is arbitrary, that the defendant couplers have pressured the hose manufacturers to refuse plaintiff the coupler price so as to stifle competition, and that his exclusion from the elite group of those who receive the lower price is the product of meetings between the two classes of defendants which have resulted in unlawful combinations and illegal agreements. Appropriate denials have been entered by the various defendants. The hose manufacturers stoutly maintain that each selects its business customers by the exercise of independent judgment based upon criteria each manufacturer fixes for its own guidance and that there is no deliberate concert of action between them.

In 1968 the Government completed a rather wide investigation of the interdealings between the hose manufacturers and couplers named in this present suit and concluded that their marketing practices were violative of Section 1 of the Sherman Act (15 U.S.C. § 1). Separate

2. These are Aeroquip Corporation, Anchor Coupling Co., Inc., Imperial-Eastman Corp., Parker-Hannifin Corp., Stewart-Warner Corp., Stratoflex, Inc., The Weatherhead Co.

criminal indictments were returned in the Eastern district of Michigan—one naming a group of hose manufacturers (who entered nolo pleas and were probated) and the other naming a group of coupling manufacturers who went to trial.[3] After nine weeks of hearing the Government's evidence in support of its allegations of conspiracy, Judge Machrowicz concluded that the Government had failed to make a showing strong enough for the case to go to the jury and granted the defendants' motions for acquittal.[4]

Rutledge's strong feelings against the defendants and the system he believes to exist prompted him to become a principal witness for the Government in the Detroit trial. His disappointment at the outcome of that trial led him to file this private treble damage action alleging violations of Section 1 of the Sherman Act in the first count of the complaint and violations of the Robinson-Patman Act in the second and third counts.

In this bifurcated trial, plaintiffs were permitted to reserve their presentation of evidence of damages until liability was established. At the conclusion of plaintiff's evidence as to liability, the defendants filed and argued motions under Rule 41(b) of the Federal Rules of Civil Procedure for a dismissal on the ground that upon the facts and the law the plaintiff had shown no right to relief. For reasons stated hereinafter this motion must be granted.

### Sherman Act § 1 Claim

■ Mindful that the Government had summoned many witnesses from widely separated places of residence to the Detroit trial at great expense, Rutledge believed that he could avoid bringing those witnesses to California to his trial and could avoid deposing them prior to the trial in their home states. He assumed that the out-of-state witnesses were unavailable within the meaning of California Evidence Code § 1291 and that he could use the Detroit trial transcript to present the testimony of those witnesses. Plaintiffs did not take the depositions of those witnesses who were beyond the reach of subpoena (although the defendants offered to make them available in the witnesses' home states.) Plaintiffs also utterly failed to make any proper showing of a foundation for unavailability of those witnesses. Furthermore, the Detroit trial involved only Sherman Act accusations and not Robinson-Patman Act charges and involved only some of the present defendants, while others of them were not parties thereto or represented at the trial in any way. For these reasons, this Court denied plaintiff the right to offer the former testimony.

■ Proper preparation of a private antitrust suit entails indefatigable pretrial discovery by the plaintiff since most of the damning evidence he must produce must come from the files and mouths of those he sues. Despite the passage of 22 months between the date of the filing of this suit and the commencement of trial, plaintiffs engaged in little or no meaningful discovery. They waited until the eve of trial to make calls upon the various defendants to produce evidence from their files which was hoped would aid their case. Most of the documents fitting the late calls were in files in warehouses across the country. The defendants made last-minute efforts to respond to the calls by having categories of documents airshipped from their distant locations. Nevertheless, plaintiffs were deprived of the advantage and information their requests for documents might have provided them because of the tardiness of their call. During the seven weeks spent trying this case, this Court has felt that, despite the Government's failure to sustain its heavier burden of proof in the Detroit criminal trial, some-

---

3. United States v. Aeroquip et al., 284 F. Supp. 114 (E.D.Mich.1968).

4. Judge Machrowicz stated, "The court finds that the inferences which must be drawn from the evidence presented in order to find independent proof of the conspiracies are, on the state of this record, far too speculative to be permissible." United States v. Aeroquip, *supra*, at 120.

where in the defendants' corporate files in Akron or Cleveland or Jackson, Michigan there might be sufficient discoverable evidence to enable these plaintiffs to prevail if only they had sought it out. But a conspiracy must be proved by independent evidence and mere suspicion of wrongdoing is not enough.

As revealed by the evidence, it was the practice of the hose manufacturers to devise trade levels or discount classifications and give the lowest price to those companies which met that particular hose manufacturer's idea of a coupler. Most other customers, including plaintiffs, got what was known as the distributor price. Each hose company had its own policy for determining fitness for the coupler rating. While its sales representatives in the field might gather information concerning a new applicant for the lowest price, they had to pass the application to the company's executive level for a decision as to whether the applicant could be sold hose for the coupler price. There was no evidence presented that the various hose manufacturers agreed among themselves as to the requirements for coupler qualification, although the hose manufacturers did generally adopt similar criteria for making their individual determinations. Each hose manufacturer was interested in determining that the customer made a fitting (or a number of them) suitable for effective use as a hose attachment; that he had an engineering staff and testing equipment; that he owned the necessary machinery to mate the fitting to the hose; and that he had the potential to buy hose in sizeable quantities and a sales staff large enough to effectively compete in the national market.

Rutledge made repeated demands upon one or more of the hose manufacturers to qualify him as a firm entitled to the coupler price but each time he was turned down because his operation failed to meet the demands of the company from which he sought to get the lowest price. His announced theory is that those couplers which had met the hose manufacturers' qualifications and were getting the lower price were desirous of seeing that their number did not swell and that, acting in concert, they put pressure upon the hose manufacturers from whom they bought to insure that the discount price would not be given indiscriminately.

■■ Rutledge's proof fell far short of establishing that the couplers met with each other or jointly with hose manufacturers and agreed to fix or stabilize prices. Absent an agreement to fix prices, there is nothing unlawful about competitors meeting and exchanging price information or discussing problems common in their industry, or even exchanging information as to the cost of their product. Maple Flooring Manufacturers Association v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1924). Likewise the admitted practice of the hose manufacturers of selling their product at different prices to different classifications of purchasers according to their functional level does not establish a Sherman 1 violation if the price structure that results does not come from an agreement among the defendants, but rather from economic facts which cost justify the differential. The couplers perform a service which is valuable to the business of the hose manufacturers and which enables the latter to confine their activity to the development and manufacture of hydraulic hose.

Plaintiffs' complaint alleges that the defendants and their co-conspirators fraudulently concealed the existence of a combination or agreement in restraint of trade by various means and methods. These allegedly included attending meetings in various hotels, making private personal and telephone contacts between the various defendants and co-conspirators, omitting from the minutes of trade association meetings any reference to the unlawful activity taking place, and denying the existence of price differentials. By these means plaintiffs allege that the defendants sought unlawfully to fix and maintain prices in the sale of hydraulic hose and secure for the couplers a price

advantage over their competitors in violation of the Sherman Act.

The defendants generally answered by denying a concert of action and denying any unlawful conduct or price fixing. The defendants asserted that any price difference given the couplers by the hose manufacturers was lawful as cost justified, was made in good faith to meet an equally low price of a competitor, or was charged by such seller in consideration of the functional services performed by the couplers which were not performed by distributors or other levels of buyers.

The allegations in plaintiffs' complaint were not borne out by the evidence. For reasons stated before, this Court denied the admission into evidence of large offered portions of the Detroit case transcript.[5] Plaintiffs did produce testimony from a Mr. William R. Adams and a Mr. Fred Sparks, each in the business of manufacturing rubber hose assemblies in other states. Both Adams and Sparks testified to their private grievances against various of the hose manufacturers stemming from their feelings that they too, like plaintiffs, should qualify for coupler prices. Neither gave evidence of meetings of the alleged conspirators, or bulletins, or any other documents which would spell out the plaintiffs' alleged claim.

Plaintiffs were allowed to read from the Detroit trial transcript the testimony of one Dick Meissner,[6] former Hose Production Manager for United States Rubber Company (now Uniroyal and a defendant in this case). Meissner told of being aware of the formation of a trade association in 1960 which included Anchor, Weatherhead, Stratoflex, Stewart-Warner, Imperial-Eastman and Parker-Hannifin. He stated that he attended one meeting of the association. (Tr. 2572). Subjects discussed were specifications, dimensions, lengths, new hose and discounts. Meissner stated that "somewhere during the discussion * * someone pointed out a disparity in the discount structure between one type of hydraulic hose and another, (and) * * that the coupling manufacturers' buying price was, in effect, 25% off the OEM price on cotton-wire-cotton while their buying price on conventional rubber-covered hydraulic was 19% off." (Tr. 2580–2581). Meissner stated there was a proposal to equalize discounts so as to grant the same discount on both cotton-wire and rubber-covered hose. (Tr. 2587).

Meissner further testified that as a member of a Forward Planning Group in United States Rubber Co. he made a presentation at the 1960 meeting with respect to the policy of his company on hydraulic hose,[7] in which he explained that his company gave couplers a lower price because "they originated and (developed) markets, directing product design and product field application. They provided a sales force for my product, to which they attached their own product, a piece of hose really being no good by itself until it has fittings on the end with which to attach it to something else, and they performed a valuable research and development function. I paid them in effect for the job they did for me. It was the most economical way that I could possibly cover that market." (Tr. 2597).

As indicated by the above-described testimony, plaintiffs have failed to show evidence of an unlawful conspiracy. A conspiracy is a joint undertaking having an unlawful purpose and arising out of agreement. Standard Oil Co. v. Moore, 251 F.2d 188 (9th Cir. 1957). It is a combination of two or more persons by concerted action to accomplish

5. Notwithstanding such denial, plaintiffs in their closing briefs and arguments have liberally alluded to evidence received at the Detroit trial as though it were part of our record. It must be remembered that evidence supporting a showing of a conspiracy must find its source in our record.

6. Meissner was actually subpoenaed within this district by plaintiffs, but the parties agreed to the reading of his former testimony to spare him from having to respond to the subpoena.

7. This testimony was received at the Detroit trial against Uniroyal only.

a crime or unlawful purpose. Lynch v. Magnavox Co., 94 F.2d 883 (9th Cir. 1938); Ramsey v. United Mine Workers, 265 F.Supp. 388 (D.C.Tenn.1967), aff'd 416 F.2d 655. No express agreement is necessary to constitute an unlawful combination or conspiracy. American Tobacco Co. v. United States, 328 U.S. 781, 899, 66 S.Ct. 1125, 90 L. Ed. 1575 (1945). It is sufficient if persons with knowledge that concerted action is contemplated and invited, "give adherence to and then participate in a scheme", F. T. C. v. Cement Institute, 333 U.S. 683, 716, 68 S.Ct. 793, 811, 92 L.Ed. 1010 (1947).

■■ Although plaintiffs have shown some interdealings between defendants, they have failed by appropriate convincing evidence to show a strong likelihood of the existence of the very conspiracy charged in the complaint and the connections of the various defendants to the illicit combination. It is true that a conspiracy may be proved by other than direct evidence, for seldom are the conspiratorial villains so devoid of cleverness as to broadcast their oral agreements or publicly circulate the written memos which describe their plan. Eastern States Retail Lumber Dealers Association v. United States, 234 U.S. 600, 611, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). Although this proof need not be sufficient by itself to justify submitting the case to the jury, it still must be more than such as merely establishes the existence of some combination of defendants for any purpose. United States v. Aeroquip Co., *supra*, 284 F.Supp. at 117.

■■ Certain evidence was received provisionally during this trial, admitted only against the corporate defendant for whom the declarant spoke. Plaintiffs reserved the right later to move for the admission of said evidence as against all the defendants once they succeeded in establishing their allegations of conspiracy from independent evidence. Once an unlawful agreement is established by independent evidence, the hearsay declarations of all its members may be used to bind all members of the conspiracy. This is based upon the principle that a conspiracy creates an agency relationship and that therefore each member is authorized by the other members to perform acts in furtherance of the common objective. Las Vegas Merchant Plumbers Association v. United States, 210 F.2d 732 (9th Cir. 1954), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645. However, since plaintiffs have failed to make an initial showing of the likelihood of a conspiracy, their motion to connect must be denied.

After some 35 witnesses had been called, plaintiffs only established that the hose manufacturers do indeed sell hydraulic hose to those they qualify as couplers at a lower price than they sell the same hose to distributors, jobbers or consumers. Through the witnesses called by the plaintiffs, the defendants have to this point succeeded in establishing that each hose manufacturer sets its own policy for qualifying a new prospect for the coupler price level and that this is not done pursuant to criteria established in common among them. The evidence indicates that there are instances where one hose manufacturer will sell to a firm at the lower price because that manufacturer qualifies the firm as a coupler, although other manufacturers refuse to consider that firm entitled to their coupler rates. Defendants have further proven that their granting of the lower rate to couplers is not arbitrary but is cost justified. Plaintiffs' conspiracy charges in the first count of the complaint must fall.

### Robinson-Patman Sections 2(a) and 2(d) Claims

Count 2 alleges a claim by plaintiffs against the hose company defendants wherein plaintiffs assert that said defendants sold their hose to couplers at prices ranging from 18 to 25% less than the prices which plaintiffs had to pay said defendants for hose of like grade and quality, in violation of Sections 2(a) and 2(d) of the Robinson-Patman Act (15 U.S.C. § 13(a) and (d)).

Section 2(a) provides in pertinent part: "That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, * * * and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination * * *"

■ Plaintiffs sought to prove a violation of this section by pointing to so-called horizontal price fixing. However, proof of a violation of section 2(a) must consist of groups of two or more contemporaneous sales which, when compared, permit the drawing of an inference of price discrimination. Bruce's Juices v. American Can Co., 330 U.S. 743, 755, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); Becker v. Safelite Glass Co., 244 F.Supp. 625, 635 (D.Kan.1965). The sales should be contemporaneous to eliminate the possibility that their differences are caused by market fluctuations ordinarily happening during an extended time interval between sales. Texas Gulf Sulphur v. J. R. Simplot Co., 418 F.2d 793, 808 (9th Cir. 1969); Fred Meyer v. F. T. C., 359 F.2d 351, 357 (9th Cir. 1966).

■ Plaintiffs presented no proof of purchases by them supporting liability.

Nor have plaintiffs offered proof of sales to alleged "favored buyers" which show discrimination when compared to plaintiffs' purchases. Moreover, plaintiffs have presented no evidence that goods purchased by them and goods purchased by "favored buyers" were of like grade and quality and thus usable as comparative purchases. Plaintiffs have also failed to show that at least one of two such sales was made in interstate commerce. Likewise, plaintiffs have left this Court without any viable proof that the alleged discrimination had the effect of substantially lessening competition [8] or injuring plaintiff.[9] Nor have they successfully assailed the statutory defenses asserted by the hose defendants under section 2(a).

■ Rutledge testified that beginning in about 1960, he contacted various hose manufacturers and bought from some of them at distributor level prices, but was unable to get them to sell to him at the coupler level.[10] The hose manufacturers also refused to provide him with price sheets for the coupler level. During the trial Rutledge submitted hastily prepared charts comparing the coupler and distributor prices of the various hose manufacturers.[11] However, these provided only sketchy and fragmented assistance to his burden of proof. Section 2(a) can be tested only against specific sales and not by a showing of a general pricing system. Proof of the existence in the hose industry of customer classifications under which different prices are offered to different levels of the trade is not a showing of a section 2(a) violation. Consequently, plaintiffs' evidence has failed to establish

---

8. Section 2 of the Act only prohibits price discrimination by a seller where the effect causes or may cause forbidden competitive injury. Tri-Valley Packing Association v. F.T.C., 329 F.2d 694 (9th Cir. 1964); Balian Ice Cream Co. v. Arden Farms, 231 F.2d 356 (9th Cir. 1955); Rowe, Price Discrimination Under the Robinson-Patman Act (1962) at 139, 186 et seq.

9. Flintkote Co. v. Lysfjord, 246 F.2d 368, 392 (9th Cir. 1957).

10. Rutledge testified that for one year he got the coupler price from Uniroyal, but stopped purchasing from them in 1965 (Tr. 2179 to 2180) because he got a better price from Electric Hose and Rubber Co.

11. These charts were prepared during the trial from price lists and invoices tardily summoned by plaintiff from the defendants at the beginning of the trial, rather than during pretrial discovery.

a 2(a) violation by the hose manufacturing defendants in the present case.

Plaintiffs' section 2(d) claims may be disposed of quickly, both because plaintiffs have produced no evidence supporting such a claim and because they quite likely misread the proscription of that statute. Section 2(d) of the Robinson-Patman Act provides:

"It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities." (15 U.S.C. Sec. 13(d).)

■■■ This section does not refer to benefits to "favored buyers" in connection with the original sale to the buyer, such as discounts; rather it refers to payments in connection with the resale by the buyer of the goods, for advertising, promotion or other similar purposes. Exquisite Form Brassiere, Inc. v. F. T. C., 112 U.S.App.D.C. 175, 301 F.2d 499 (1961); Rowe, Price Discrimination Under the Robinson-Patman Act, at 371. Cf. Surprise Brassiere Co. v. F. T. C. 406 F.2d 711 (5th Cir. 1969). Section 2(d) also does not apply to a seller who charges different prices to different buyers according to the functional level of the buyer. This seems to be supported by the legislative history of the Act [12] and the policy of the Federal Trade Commission.[13]

In this case there has been no evidence of payment by any hose manufacturer to any coupler of any sum in connection with any of the services with which section 2(d) concerns itself, to wit, promotion, advertising or similar activities connected with the resale of goods. Plaintiffs' claim based on a violation of this section must fail.

### Robinson-Patman Section 2(f) Claim

It must logically follow that since plaintiffs have shown no section 2(a) violation, the coupler defendants have not violated § 2(f) which forbids a buyer to induce or receive a discrimination in price which is prohibited by the section.

Section 2(f) of the Robinson-Patman Act reads as follows:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f).

■■■ The burden of plaintiffs in establishing a section 2(f) claim is to show that one or more of the couplers induced a hose manufacturer to sell to him at a price which discriminated and which the buyer knew was not within one of the seller's defenses under sections 2(a) and 2(b) of the Robinson-Patman Act, such as that the price differentials reflect cost differences, were the result of fluctuating market conditions or amounted to bona fide attempts to meet competition. Automatic Canteen Co. of America v. F. T. C., 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953).

It is to be noted that conspiracy forms no part of a claim under section 2(f). Plaintiffs' task was to take each coupler they intended to prove a 2(f) claim against and show that by reason of conversations had with a seller of hose, or by some other conduct, that coupler induced the seller to sell to him at a lower price which was discriminatory and which was, as known to the coupler, not cost justified. In a Robinson-Patman

12. 80 Cong.Rec. 9418 (1936).

13. 1 CCH Trade Reg.Rep. 6072–6073 (1960).

action he is required to make this showing by a meticulous attention to details. J. Weingarten, Inc., 62 F.T.C. 1521, 1927.

 A buyer is not liable under this section merely upon a showing that he knowingly induced and received a lower price. Texas Gulf Sulphur v. J. R. Simplot, *supra,* 418 F.2d at 803. Nothing in section 2(f) is intended as "putting a buyer at his peril whenever he engages in price bargaining." Automatic Canteen, *supra,* 346 U.S. at 73, 73 S.Ct. at 1024. There is a burden upon the complaining party to show that the price differential exceeded any cost savings the seller may have enjoyed in sales to the favored buyer. *Automatic Canteen, supra,* at 62, 73 S.Ct. 1017. Since plaintiffs have failed to meet their burden, the claim under section 2(f) must fail.

Plaintiffs' motion to connect is denied. Defendants' motion under Rule 41(b) of the Federal Rules of Civil Procedure is granted. Defendants are ordered to prepare and lodge proposed Findings of Fact and Judgment consistent with this opinion.